J-S10016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.R., FATHER | No. 1978 EDA 2015 |

Appeal from the Decree Entered June 4, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000320-2015
CP-51-DP-0002290-2013
FID: 51-FN-004440-2013

| | |
|---|---|
| IN THE INTEREST OF: Z.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.R., FATHER | No. 1978 EDA 2015 |

Appeal from the Order Entered June 4, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000320-2015
CP-51-DP-0002290-2013
FID: 51-FN-004440-2013

BEFORE: GANTMAN, P.J., BENDER, P.J.E. and PLATT, J.*

MEMORANDUM BY BENDER, P.J.E.:           **FILED FEBRUARY 05, 2016**

S.R. (Father) appeals from the decree entered June 4, 2015, in the

Court of Common Pleas of Philadelphia County, which involuntarily

terminated his parental rights to his minor son, Z.R. (Child), born in

---

*Retired Senior Judge assigned to the Superior Court.

November of 2012.[1]  In addition, Father appeals from the order entered that same day, which changed Child's permanency goal to adoption.[2]  We affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> [In November of] 2012, the Department of Human Services (DHS) received a General Protective Services (GPS) report alleging that [Child] tested positive for cocaine and opiates at birth.  The report was substantiated.
>
> On July 30, 2013, In Home Services (IHS) [were] implemented by [] Community Umbrella Agency (CUA) Asociaci[ó]n [] Puertorrique[ñ]os en March[a] (APM).
>
> On August 26, 2013, [M]other missed her intake appointment at [t]he Wedge Medical Center for substance abuse treatment where she had been previously referred by DHS.
>
> On September 4, 2013[,] APM visited the family home where both [M]other and [F]ather resided.
>
> On September 19, 2013, APM held a Single Case Plan (SCP) meeting.  The objective set for the parents was to cooperate with social services.
>
> On October 10, 2013, the mother missed another intake appointment at [t]he Wedge.

---

[1] The parental rights of Child's mother, L.B. (Mother), were terminated by a separate decree.  Mother is not a party to the instant appeal.

[2] We note that it was improper for Father to file a single notice of appeal from both the termination decree and goal change order.  *See* Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  However, we decline to quash Father's appeal, as we discern no prejudice stemming from Father's procedural misstep, particularly, since Father has waived any issue relating to the goal change order.

On November 5, 2013[,] DHS learned that [M]other and [F]ather failed to comply with CUA's objectives. [M]other and [F]ather refused to allow APM's case manager to visit with [C]hild.

On November 8, 2013, [F]ather was arrested and charged with intentional possession of a controlled substance and endangering welfare of children.

On November 22, 2013, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine ordered that DHS conduct a Parent Locator Search (PLS) regarding [M]other and that APM obtain an Order of Protective Custody (OPC) if there was imminent risk/danger to [C]hild. [F]ather was incarcerated at the House of Corrections.

On December 4, 2013[,] DHS received a GPS report alleging that [M]other was an active substance abuser and was unable to meet [C]hild's daily basic needs. [C]hild was residing with [M]other and [F]ather. [F]ather was the primary caretaker[.] [H]owever, he was incarcerated. [Child], Z.R.[,] was not safe in [M]other's care. The report was substantiated. [M]other admitted to the police that her drug of choice was heroin.

On December 4, 2013[,] DHS learned that the family lived in a room of a home which was inappropriate. DHS obtained an OPC for [Child] and placed him in a foster care home through APM.

A shelter care hearing was held on December 6, 2013[,] before the Honorable Jonathan Q. Irvine. Judge Irvine ordered [Child] temporarily committed to DHS. [F]ather remained incarcerated.

On December 20, 2013, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. [Child] was adjudicated dependent and committed to DHS. [F]ather was incarcerated at the time of the hearing. Supervised visits were ordered for [F]ather upon his release from prison.

The matter was then listed on a regular basis before judges of the Philadelphia Court of Common Pleas – Family Court Division – Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa[.]C.S.A. §[]6351, and evaluated for the purpose of determining or reviewing the permanency plan of [C]hild.

In subsequent hearings, the [permanency review orders] reflect the Court's review and disposition as a result of evidence presented, addressing and … finalizing the permanency plan.

On December 22, 2014, APM held a SCP meeting. The objectives identified for [F]ather were: (1) cooperate with the case manager, (2) visit with [C]hild, (3) [] attend the Achieving Reunification [Center] (ARC) and (4) [] submit to three random drug screens at the Clinical Evaluation Unit (CEU).

On January 8, 2015, a permanency hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine found that [F]ather had made no compliance with the permanency plan.

On February 12, 2015, [F]ather was arrested and charged with drug related offenses. Father is currently incarcerated at the Detention Center.

Trial Court Opinion, 8/11/2015, at 1-3 (unpaginated).

On May 20, 2015, DHS filed a petition to terminate Father's parental rights to Child involuntarily, as well as a petition to change Child's permanency goal to adoption. A termination and goal change hearing was held on June 4, 2015. Following the hearing, the trial court entered its decree terminating Father's parental rights, and its order changing Child's permanency goal. Father timely filed a notice of appeal on June 24, 2015, along with a concise statement of errors complained of on appeal.

Father now raises the following issue for our review.

Did the [trial c]ourt err as a matter of law and abuse its discretion when it terminated [F]ather's parental rights and changed the child's goal to adoption where [DHS] failed to present clear and convincing evidence that Father evidenced a settled purpose of relinquishing parental claim to the child; and failed to present clear and convincing evidence that the child would not be harmed by termination of [F]ather's parental rights?

Father's brief at 3.[3]

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

---

[3] While Father purports to challenge the order changing Child's permanency goal to adoption, his brief on appeal contains no substantive discussion of this issue, nor does it contain any citation to relevant authority. Accordingly, Father has failed to preserve any challenge to the goal change order for our review, and we address only the decree terminating Father's parental rights. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

- 6 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93

A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the trial court found that Father's parental incapacity has left Child without essential parental care, control, or subsistence, and that Father cannot, or will not, remedy his incapacity. The court emphasized that Father has twice been convicted of drug-related crimes since the case began, and that Father currently is incarcerated. Trial Court Opinion, 8/11/2015, at 4 (unpaginated). The court also noted that Father has failed to complete his SCP objectives, and has not visited with Child since November of 2014. *Id.*

Father argues that he completed a drug and alcohol treatment program, and engaged in regular visits with Child. Father's brief at 6-10, 13-17. Father insists that he only stopped visiting with Child because his new job conflicted with his visits, and because his request to change his visitation schedule was denied. *Id.* Father also contends that he asked for visits with Child after his most recent incarceration, but that no visits were provided. *Id.*

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. During the termination and goal change hearing, DHS presented the testimony of CUA case manager, Natasha James. Concerning Father's SCP objectives, Ms. James testified that Father failed to attend ARC, and did not complete parenting, housing, and financial

workshops.[4]  N.T., 6/4/2015, at 15.  Father also failed to complete drug and alcohol treatment.[5]  *Id.* at 14.  Father attended visits with Child for a period of about three months in 2014.  *Id.* at 16.  However, there were "significant absences" in Father's visitation schedule, even when he did attend.  *Id.* at 21.  Father then had no contact with the CUA from October of 2014 until March of 2015.  *Id.* at 16.  Since being incarcerated a second time, Father has not sent any letters or gifts to Child.  *Id.* at 19.  Father has requested visits.  *Id.* at 19, 21, 27-28.

Father testified that he currently is on a waiting list to receive drug and alcohol treatment while incarcerated.  *Id.* at 32.  Upon being released from incarceration, Father intends on participating in a group called "Self-Help."  *Id.*  Father described Self-Help as "like an outpatient program. . . . It's like NA.  A regular NA meeting that goes on every day for two hours, an hour to two hours."  *Id.*  Father stated that he visited with Child from June of 2014 until approximately November of 2014.  *Id.* at 33.  According to

---

[4] As noted *supra*, Father's objectives were to (1) cooperate with Child's case manager; (2) visit Child at the CUA; (3) attend ARC, including the parenting, housing, and financial workshops; and (4) submit three random drug screens prior to the next court listing.  Petition for Involuntary Termination of Parental Rights, 5/20/2015, at 24 (statement of facts); N.T., 6/4/2015, at 8-9 (stipulating that social worker would testify consistent with the statement of facts).

[5] Counsel for Father and Counsel for DHS later agreed that Father completed drug and alcohol treatment in 2014, but "was then re-referred back to the CEU."  N.T., 6/4/2015, at 23.

Father, he was no longer able to attend visits because they conflicted with his work schedule. *Id.* at 34. Father requested a modified visitation schedule, but his schedule was not changed. *Id.* Father anticipated being released from incarceration in November of 2015. *Id.* at 35. Father indicated that he has no place to live upon his release, but hopes to be placed in a recovery house. *Id.* at 36.

Accordingly, the record supports the conclusion of the trial court that Father is incapable of providing Child with essential parental care, control, and subsistence necessary for Child's physical or mental well-being. Moreover, Father cannot, or will not, remedy his parental incapacity. Since this case began in 2013, Father has twice been arrested and incarcerated for drug crimes. Father has failed to attend ARC, and he requires additional drug and alcohol treatment. Further, Father has displayed only a minimal interest in Child. After being released from his initial incarceration, Father participated in visits with Child for a period of about three months. However, Father stopped visiting with Child in October or November of 2014, and he did not contact the CUA again until March of 2015. No relief is due.

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding

analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

Here, the trial court found that Father has had minimal contact with

Child since the case began, and that Child would not suffer irreparable harm

if Father's parental rights were terminated. Trial Court Opinion, 8/11/2015,

at 6 (unpaginated). The court also found that Child is bonded with his foster

parent. *Id.* Father argues that he and Child are bonded, and that DHS

failed to prove that Child will not suffer irreparable harm. Father's brief at

11, 17-18.

We again conclude that the trial court did not abuse its discretion. Ms.

James testified that Child is bonded with his foster mother. N.T., 6/4/2015,

at 18. Ms. James acknowledged that notations in the case file indicate that

Child also displayed a "good attachment" to Father during their visits in 2014. *Id.* at 26. Child "was aware of who his father was during the visitations," and "would cry when the visits were over . . . ." *Id.* However, Ms. James had not noticed that Child's lack of recent contact with Father had caused him any harm. *Id.* at 17-18. Further, Ms. James had no reason to believe that terminating Father's parental rights would cause Child any permanent emotional harm. *Id.* at 18, 22. Ms. James opined that terminating Father's parental rights would be in Child's best interest. *Id.* Father testified that it would be in Child's best interest for him to sign over his parental rights to his mother and sister, so that they can care for Child. *Id.* at 38, 44.

Thus, the record confirms that terminating Father's parental rights would best serve the needs and welfare of Child. Child is bonded with his foster mother, and has not suffered any harm due to his lack of contact with Father. While Child reacted positively to Father during their visits in 2014, it is unlikely that the two of them share a parent/child bond. As this Court has explained,

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to

correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citation and quotation marks omitted).

Moreover, to the extent that Child and Father are bonded, it is clear that their bond is outweighed by Father's inability or unwillingness to parent Child, and by Child's need for permanency. *See C.D.R.*, 111 A.3d at 1220 (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability). Father is not entitled to relief.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child, we affirm the decree of the trial court. In addition, we conclude that Father has waived any challenge to the order changing Child's permanency goal to adoption, therefore, the order is likewise affirmed.

Decree and Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/5/2016

- 13 -